UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DANTE L. GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | 06 C 1 |
| | ) | |
| v. | ) | |
| | ) | Honorable Charles R. Norgle |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Charles R. Norgle, District Judge

Before the court are the parties' cross Motions for Summary Judgment. For the following reasons, Defendant's Motion for Summary Judgment is granted, and Plaintiff's Motion for Summary Judgment is denied. The judgment of the Commissioner is affirmed.

**I. BACKGROUND**

**A. Facts**

On February 12, 2002, Plaintiff Dante L. Green ("Green"), then twenty-four years old, was assaulted by an individual wielding a baseball bat. Green was beaten severely about the head and upper body. Emergency medical personnel transported Green to the emergency room at the West Suburban Hospital in Oak Park, Illinois. Hospital records indicate that Green was "barely responsive and seizing" when he arrived. Physicians stabilized Green's airway and induced muscle paralysis with medication. Green was later given Dilantin to "prevent further seizure activity."

1

The next day, Green was transferred to the Trauma Center at the Loyola University Medical Center in Maywood, Illinois. Green was diagnosed with a closed head injury, seizures, and facial and rib fractures. Physicians stabilized Green with anticonvulsant medication, and placed him on mechanical ventilation. Green remained unresponsive throughout his stay at Loyola, which was further complicated by a bout with pneumonia. On February 28, 2002, Green was discharged to the Kindred Hospital in Northlake, Illinois.

Green continued to suffer from seizures and breathing difficulties at Kindred. Physicians treated Green with various medications to control the seizures, and additional measures were taken to stabilize Green's ability to breathe on his own. Medical records indicate that Green regained consciousness on March 22, 2002. Kindred discharged Green on May 24, 2002.

On June 5, 2002, Green began physical therapy at West Suburban. He was diagnosed with "hemiparesis secondary to brain injury." Hemiparesis is defined as "slight paralysis affecting one side [of the body] only." STEDMAN'S MEDICAL DICTIONARY 631 (Fifth Unabridged Lawyers' Edition 1982). Hospital records indicate that Green's hemiparesis negatively affected his balance and his ability to walk, and caused significant weakness and loss of motion in his left arm and leg. Green's course of physical therapy ended on July 9, 2002.

Following physical therapy at West Suburban, Green visited Dr. Peter Biale, a consultive examiner for the Illinois Bureau of Disability. Dr. Biale examined Green, and reported, *inter alia*, the following.

> [Green] states that he has had seizures when he was in the hospital. At present, he takes Tegretol and there is no seizure activity since March of 2002 . . . The patient is [a] well nourished, well developed, cooperative male in no acute distress. He appeared his stated age. When he moved about, there was no apparent hesitation. When he moved from a sitting to a supine position and back up again, there was no

2

difficulty... His gait was normal. He was not able to squat down, [or] do the heel or toe walk because he claimed he loses balance. Tandem gait was normal. He was able to get in and out of the examination table without difficulty. Finger grasp and handgrip was unimpaired bilaterally.

On July 9, 2002, Green began treatment with Dr. David Weiss ("Weiss"), a rehabilitation specialist at the Marianjoy Medical Group in Wheaton, Illinois. Weiss's initial examination of Green determined, *inter alia*:

> Since going home he has been in outpatient physical therapy and things have been improving, although he still has problems with walking and left arm weakness. His sleep is good. His appetite is good... [Green is a] [w]ell-developed, thin, 24-year old black male sitting on the examining table in no apparent distress. Neurologically [Green] was alert, oriented x 4. He had normal concentration. He could follow three step commands. He had good impulse control. He had mild decrease in concentration. He had normal word association... He had full range of motion in all extremities, except for the left shoulder which in abduction and flexion was to 120 degrees... Mr. Green is status-post traumatic brain injury with resulting mild memory deficits and balance deficits.[1]

Weiss determined that Green should continue with outpatient physical therapy. Green visited Weiss again on August 13, 2002. Weiss reported, *inter alia*:

> Mr. Green feels a little better. Physical therapy has been helpful. His gait is markedly improved over the last week... He has been going to speech therapy, and will be discharged on Friday. His sleep is good and he gets 12 hours per day. Anger is no different. He feels as though he is not depressed, although he has no energy in the morning and he cannot gain any weight.

Weiss noted that Green had pain and decreased range of motion in his left shoulder, and therefore directed Green to get an x-ray. Weiss also instructed Green to continue physical therapy, and prescribed Zoloft for possible depression.

---

[1] The court notes that Green suffered a left shoulder dislocation in 2000 unrelated to the February 12, 2002 assault.

Following Green's October 1, 2002 visit, Weiss reported, *inter alia:*

> Physically Mr. Green is doing well. Socially he has quite a bit of problems. His sleep is good and it is decreased in the amount to normal levels. He has been discharged from physical therapy. His weight is stable. He notes no new physical problems . . . Left shoulder had full range of motion and normal strength. His gait was slightly spastic on the left side but only to professional eyes. He had normal standing balance and normal sitting balance . . . At this time Mr. Green needs to move on to be reintegrated into normal society by getting a job . . . We will have him go to Schwab [Rehabilitation Institute in Chicago, Illinois] for the Department of Rehabilitation Services for a job application.

Green did not visit Schwab, but returned to Weiss at Marianjoy in March 2003 with additional complaints, including headaches, nightmares, insomnia, increased anger, loss of concentration, and shoulder pain. Weiss injected Green's shoulder with steroids, prescribed various medications for Green's other symptoms, and referred Green to Schwab again, this time for "psychological treatment for the late effects of traumatic brain injury."

Green underwent neuropsychological screening administered by Megan McCue, M.A. and Claudia Mosier, Psy. D. in March and April of 2003. The screening indicated, *inter alia*:

> Mr. Green would make repeated mistakes and was unable to incorporate information from those mistakes to reason towards the correct answer. Furthermore, it was also noted that Mr. Green needed repeated reminders about the directions and needed verbal reinforcement to prevent him from terminating the test prematurely. Mr. Green's performance on the Token Test suggests difficulty processing and executing increasing complex bits of information . . . An example of the level of complexity to which Mr. Green is able to respond is demonstrated in the following direction: "Touch the white circle and the red circle." This information suggests the presence of neuropsychological impairment . . . The Trailsmaking Tasks, which assess skills in executive functioning, such as organization and planning, were administered. On Trails A, Mr. Green demonstrates moderate impairment in neuropsychological functioning, specifically in his ability to plan, organize and execute simple sequential information in written form. On Trails B, a task that assesses mental flexibility, speed of cognitive processing and ability to plan, Mr. Green demonstrated significant impairment in his ability to effectively scan, plan and execute information . . . [I]t is noted that Mr. Green demonstrates extreme difficulty with visual-motor skills, or paper-and-pencil tasks . . . Furthermore, it should be noted that lowered impulse

4

control is notes in Mr. Green's performance on the Categories Test and reported difficulties with anger management . . .

McCue and Mosier summarized the test results as follows.

> Information from the clinical interview, mental status exam, WAIS-III and neuropsychological testing suggest the presence of criteria associated with a DSM-IV diagnosis of Dementia Due to Head Trauma. Symptoms associated with this disorder include the presence of cognitive deficits manifested by the client's memory impairment, specifically his difficulty in learning new information, as well as a disturbance in executive functioning, which is noted throughout both the clinical interview and test administration. These deficits appear to cause significant impairment in social and occupational functioning. Given Mr. Green's reported academic history, this information indicates a significant decline from a previous level of functioning. Current deficits may be related to the client's recent trauma and are therefore associated with a cognitive disorder.

In evaluating Green's Mental Residual Functional Capacity ("MRFC"), McCue and Mosier indicated that Green was "Markedly Limited" in, *inter alia*, the following categories:

> The ability to remember locations and work-like procedures; The ability to understand and remember very short and simple instructions; The ability to carry out detailed instructions; The ability to maintain attention and concentration for extended periods; The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; The ability to sustain an ordinary routine without special supervision; The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; The ability to accept instructions and respond appropriately to criticism from supervisors; The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

Green returned to Weiss on August 19, 2003. Weiss reported, *inter alia*:

> Mr. Green comes in today noting that his shoulder does feel better. The injection did help. Sleep is good. He has no anger . . . Left shoulder had full range of motion. In terms of follow through, we will get him to Schwab for the traumatic brain injury program and psychology. He will do this through vocational rehabilitation. We talked at length about him getting a job and he seems to indicate he will.

5

On April 1, 2004, Green indicated to Weiss that he had began to suffer from headaches and nightmares. Weiss prescribed medication and psychological treatment. Following Green's visit on May 27, 2004, Weiss reported, *inter alia*: "Mr. Green returns to the clinic today feeling normal. He has no headaches or nightmares to speak of . . . He has been going to physical therapy and doing somewhat of a home exercise program . . . Mr. Green is better." On August 3, 2004, however, Weiss reported, *inter alia*:

> Mr. Green returns to the clinic today noting his headaches and nightmares have returned. This has been coming on for the last two weeks. He notes poor appetite and an increase in anger. He is frustrated with the fact that he cannot find a job . . . He had full range of motion in all four extremities . . . Mr. Green has a recurrence of his nightmares due to the late effects of brain injury.

Weiss prescribed medication, and again directed Green to attend vocational rehabilitation at Schwab. Green visited Weiss again on October 14, 2004. Weiss reported that Green continued to have nightmares, and had not received vocational training. Green last visited Weiss on January 6, 2005. Weiss noted that Green's nightmares were "off and on," and that Green had still not attended vocational therapy.

During much of the time Green was being treated by Weiss, Green was also visiting Dr. Anthony Tze, an internist practicing in River Forest, Illinois. Following an appointment with Green on February 7, 2003, Tze opined that Green was "neurologically well-recovered," and encouraged Green to begin occupational training. Green saw Tze again on May 9, 2003. Green reported feeling well, and Tze repeated his recommendation that Green undergo vocational training. Tze again recommended vocational training to Green during appointments on July 18, 2003; August 19, 2003; October 17, 2003; and on an unspecified date in October 2004. There is no indication in the record that Green ever attended vocational training.

In February and March 2005, Green visited Dr. Georgeann Russell, a psychologist. In Dr. Russell's Mental Capacities Assessment of Green, she indicated that Green was either moderately or markedly limited in a number of work-related areas, such as reliability and the ability to deal with work-related stress. Dr. Russell concluded that Green could not perform reliably in a workplace.

> At the present time I do not believe Mr. Green can function in a reliable manner in a job setting due to his depression. His depression includes a notable degree of apathy, poor motivation, impaired concentration and poor frustration tolerance. Mr. Green describes symptoms of depression and anxiety following his injury. Mr. Green has been fearful of leaving his home due to concerns that he may see the individual who assaulted him. He spends most of his day in bed [and has] minimal drive or motivation. His lack of interest and motivation seem primarily related to his depression. He does not believe his life can or will get better.

## B. Procedural History

On May 7, 2002 Green's grandmother filed an application for Supplementary Security Income on Green's behalf. The Social Security Administration ("Administration") denied Green's claim on September 9, 2002, determining that Green was not disabled. On December 11, 2002 the Administration denied Green's request for reconsideration. Green filed a Request for a Hearing by Administrative Law Judge ("ALJ") on December 26, 2002. A hearing was held before an ALJ on January 11, 2005. On April 20, 2005, the ALJ issued a written ruling that Green was not disabled. Green timely filed a Request for Review of Hearing Decision with the Administration Appeals Council, but the Appeals Council denied Green's request for review on September 23, 2005, making the ALJ's decision the final decision of the Commissioner. See 20 C.F.R. § 416.1481.

Green then timely filed the instant Complaint in the Northern District of Illinois seeking judicial review of the Commissioner's decision. The parties have filed cross Motions for Summary Judgment. These Motions are fully briefed and before the court.

## II. DISCUSSION

### A. Standard of Decision

To make a successful claim for disability benefits under the Social Security Act ("SSA"), an individual must demonstrate that he or she is unable "'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months.'" Windus v. Barnhart, 345 F. Supp. 2d 928, 930 (E.D. Wis. 2004) (quoting 42 U.S.C. § 423(d)(1)(A)). Social Security regulations prescribe a five-step test to determine whether an individual is disabled:

> The following steps are addressed in order. (1) Is the claimant presently unemployed? (2) Is the claimant's impairment 'severe?' (3) Does the impairment meet or exceed one of the list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step, or on steps (3) and (5) to a finding that the claimant is disabled. A negative answer, at any point other than step (3), stops inquiry and leads to a determination that the claimant is not disabled.

Taylor v. Schweiker, 739 F.2d 1240, 1241 n.1 (7th Cir. 1984); see also Windus, 345 F. Supp. 2d at 930; 20 C.F.R. § 416.920(a)(4).

Under this five-step test, a claimant will be found presumptively disabled if he or she "makes the necessary showing at steps 1-3." Windus, 345 F. Supp. 2d at 930. If the claimant cannot show that he or she is presumptively disabled, "the ALJ must consider whether the

8

claimant possesses the residual functional capacity ("RFC") to perform her past work." Id. If the claimant does not have the necessary RFC to return to his or her prior position, "the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of other jobs that exist in the national economy." Id. The Commissioner can satisfy this burden by either presenting the testimony of a vocational expert, or "through the use of the 'Medical-Vocational Guidelines' . . . a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education, and work experience." Id. at 930-31 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2).

The court will not disturb the Commissioner's finding as to a claimant's disability as long as that decision "is supported by substantial evidence and is free from legal error." Steele, 290 F.3d at 940; see also Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003). "Evidence is 'substantial' if it is sufficient for a reasonable person to accept as adequate to support the decision." Johansen v. Barnhart, 314 F.3d 283, 287 (7th Cir. 2002). "To determine if substantial evidence exists, the court reviews the record as a whole, but is not allowed to substitute its judgment for the ALJ's by 'reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility.'" Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000) (quoting Williams v. Apfel, 179 F.3d 1066, 1071-72 (7th Cir. 1999)). This court will therefore not make any determination as to whether Green is disabled. Our review is limited to whether the Commissioner's finding of not disabled is supported by substantial evidence. See Lee v. Sullivan, 988 F.2d 789, 792 (7th Cir. 1993).

9

## B. The Commissioner's Determination that Green is Not Disabled is Supported by Substantial Evidence

### *1. The ALJ's Report*

As the court has explained, a five step process is used to determine whether an individual is disabled under the SSA. Under the first step of this procedure, the ALJ determined that even though Green had briefly worked as an "overnight caretaker" of a house that was under construction, Green had not engaged in sufficient "substantial gainful activity" as defined by Social Security regulations during the time period in question to be disqualified from receiving benefits. Under the second step, the ALJ determined that Green's "significant fractures and head injuries" constituted a severe impairment.

On the third step of the five step process, however, the ALJ determined that even though Green's impairments were severe, they did not meet or equal the requirements of a listed impairment as defined by Social Security regulations. After considering all the medical, psychological, and neurological reports in the record, the ALJ determined that Green's conditions did not meet the SSA listings for Traumatic Brain Injuries, Organic Brain Damage, Depression, or Anxiety. In making this determination, the ALJ thoroughly analyzed all of the above noted reports, credited Weiss's and Tze's reports as reliable, and discounted Mosier's and Russell's reports as unreliable.

The ALJ reasoned that Weiss and Tze had seen Green numerous times over a period of several years following his discharge from Kindred, while Mosier and Russell had not treated or tested Green sufficiently to form sound opinions regarding Green's condition. Mosier, the ALJ explained, had no access to Green's medical records, and relied exclusively on Green's

10

statements during the testing procedure while drafting her report. In addition, the ALJ found Mosier's assertion that Green's IQ had dropped to be unsupported, given that the record did not establish Green's IQ prior to the attack. The ALJ discounted Russell's report because Russell had "relatively minimal contact" with Green before completing her report.

Under the fourth step of this process, the ALJ determined that Green had the physical RFC to perform "a wide range of light and most sedentary work," and the mental RFC "to perform and sustain simple unskilled work." The ALJ again discounted Mosier's and Russell's reports, instead relying heavily on progress reports from Weiss and Tze. In addition, the ALJ did not credit Green's testimony as reliable. At the disability hearing, Green testified, *inter alia*, that he could not lift more than twenty-five pounds at a time; that he could not stand in place because of dizziness; that he had trouble walking; that he became angry easily; that he had trouble sleeping; that he was depressed; and that he had memory problems. The ALJ gave virtually no weight to Green's testimony regarding his mental and physical condition. She found his testimony at the disability hearing inconsistent with his descriptions of his conditions to his doctors, noted Green's occasional failures to seek follow-up treatment, and also referenced Green's alleged "poor work history" prior to the 2002 assault in determining that Green was not credible.

In the fifth and final step of the ALJ's analysis, she relied on the testimony of a vocational expert, who indicated that a hypothetical individual with Green's limitations could be expected to perform light or sedentary work such as usher/lobby attendant/ticket taker, information clerk, order caller, parking lot cashier, surveillance monitor, or clerical sorter. Each of these jobs, the vocational expert testified, existed in large numbers in the regional economy.

Taking all of the above factors into account, the ALJ found, *inter alia*, that "there are a significant number of light and sedentary jobs within the national economy that [Green] could perform," and that Green "was not under a 'disability,' as defined by the SSA, at any time through the date of this decision . . . ." The ALJ therefore issued the following Decision. "It is the decision of the Administrative Law Judge that, based on the application filed on May 7, 2002, the claimant is not eligible for Supplemental Security Income payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act."

### *2. Substantial Evidence in the Record Supports the ALJ's Decision that Green is Not Disabled*

In this case, the ALJ was presented with vastly differing accounts of Green's mental and physical conditions, and, after careful consideration, chose to credit the reports of certain doctors and to discount the reports of others. "Weighing conflicting evidence from medical experts, however, is exactly what the ALJ is required to do." Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir. 2004). In other words, it is for the ALJ, not this court, to make determinations as to which doctor(s) to believe. Id. (citing Books v. Chater, 91 F.3d 972, 979 (7th Cir. 1996)). This court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner." Id. (citing Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003)). Green correctly points out that the ALJ rejected the opinion of Dr. Russell, Green's treating psychologist. In doing so, however, the ALJ credited the opinions of Green's rehabilitation specialist, Dr. Weiss, and Green's internist, Dr. Tze, who, in the ALJ's judgment, had a much more extensive opportunity to observe Green than Dr. Russell. This was not error by the ALJ. See Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir.

12

2003) ("An administrative law judge can reject an examining physician's opinion only for reasons supported by substantial evidence in the record.").

Green asserts that the ALJ's hypothetical questions to the vocational expert during the disability hearing were improper, because these questions did not include the limitations explained by Mosier and Russell. Hypothetical questions posed to a vocational expert "must include all limitations supported by medical evidence in the record." Young, 362 F.3d at 1003. In this case, however, the ALJ determined that Mosier's and Russell's opinions regarding Green's conditions were not supported by the record, and therefore did not include these limitations in her hypothetical questions to the vocational expert. Again, this was not error by the ALJ. See id.

The court therefore determines that the ALJ's decision in this case was supported by substantial evidence. See Steele, 290 F.3d at 942. The ALJ has properly "connected the dots" between Green's condition and the record evidence. See Young, 362 F.3d at 1002. The decision of the ALJ is affirmed.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted, and Plaintiff's Motion for Summary Judgment is denied.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

Dated: January 17, 2008